## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

NADAV POMS, On Behalf of Himself and All
Others Similarly Situated,

          Plaintiff,

          v.

CLAYTON WILLIAMS ENERGY, INC.,
CLAYTON W. WILLIAMS, JR., JORDAN
R. SMITH, DAVIS L. FORD, MEL G.
RIGGS, P. SCOTT MARTIN, NATHAN W.
WALTON, and RONALD D. SCOTT,

          Defendants.

Case No.

**CLASS ACTION COMPLAINT
FOR  VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE
ACT OF 1934**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Nadav Poms ("Plaintiff"), through his undersigned counsel, alleges upon

personal knowledge with respect to himself, and upon information and belief based upon, *inter*

*alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and the

other public stockholders of Clayton Williams Energy, Inc. ("CWEI" or the "Company") (other

than Defendants outlined below) against the Company and its Board of Directors (the "Board" or

"Individual Defendants") in connection with the January 13, 2017 entry by CWEI into a

definitive merger agreement (the "Merger Agreement") with Noble Energy, Inc. ("Noble"), Wild

West Merger Sub, Inc. ("Merger Sub"), and NBL Permian LLC ("Merger Sub 2"). Pursuant to

the Merger Agreement, the Company will become a wholly owned subsidiary of Noble (the

"Proposed Transaction"). Plaintiff asserts claims against CWEI and the Individual Defendants

for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act") (15 U.S.C. §§78n(a), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9).   Under the terms of the Merger Agreement, each share of CWEI's common stock will be converted into and become exchangeable for either (1) 3.7222 Noble common shares (the "Share Consideration"); (2) $34.75 in cash and 2.7874 Noble common shares (the "Mixed Consideration"); **or** (3) $138.39 in cash (the "Cash Consideration") (collectively, the "Merger Consideration").

2.     The Merger Consideration does not adequately value the Company's future prospects or its inherent value. Unsurprisingly, the Proposed Transaction is the result of a conflicted process that provided unique benefits not shared by the Company's non-insider stockholders to Ares Management LLC (with certain of its affiliates, "Ares" or "Ares Management") (the Company's largest stockholder) and Defendant Williams and his family (the Company's second largest stockholders).

3.     What is more, in order to convince CWEI's stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a Form S-4 Registration Statement with the Securities and Exchange Commission on or about March 6, 2017 (with its March 21, 2017 amendment, the "Registration Statement") in violation of Sections 14(a) and 20(a) of the Exchange Act. The Registration Statement contains incomplete and materially misleading information regarding: (1) the process that resulted in the Proposed Transaction, (ii) the financial analyses conducted by Goldman, Sachs & Co. ("Goldman") and Evercore Group L.L.C. ("Evercore"), and (iii) the projections used by Goldman and Evercore in those analyses.

4.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to CWEI stockholders before the vote on the

Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

6.      Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District and (ii) CWEI is incorporated in this District.

## PARTIES

**A.      Plaintiff**

8.      Plaintiff is, and at all relevant times was, a continuous shareholder of CWEI.

**B.      Defendants**

9.      Defendant Clayton Williams Energy, Inc. (previously defined as "CWEI") is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 6 Desta Drive, Suite 6500, Midland, Texas 79705.

10.      Defendant Clayton W. Williams, Jr. ("Williams") has served as Chairman of the Board, Chief Executive Officer ("CEO"), and as a director of the Company since September 1991. Prior to March 2015, Defendant Williams also served as President of the Company.

Defendant Williams beneficially owns, either individually or through his affiliates, 17.6% of the outstanding shares of CWEI's common stock. In addition, the Williams Children's Partnership, Ltd. ("WCPL") – a limited partnership of which Defendant Williams' adult children are the limited partners – owns an additional 17.3% of the outstanding shares of CWEI's common stock.

11.     Defendant Mel G. Riggs ("Riggs") has served as a director of the Company since January 2006 and as President since March 2015. Defendant Riggs is the sole member in the general partner of WCPL and has the power to vote or direct the voting of the shares held by WCPL.

12.     Defendant Jordan R. Smith ("Smith") has served as a director of the Company since July 2000.

13.     Defendant Davis L. Ford ("Ford") has served as a director of the Company since February 2004.

14.     Defendant P. Scott Martin ("Martin") has served as a Preferred Director of the Company since March 2016, having been appointed to the Board by Ares Management LLC (with certain of its affiliates, "Ares" or "Ares Management").[1] Defendant Martin is the Founder, CEO, and Senior Partner of BlackBrush Oil & Gas, LP, which is a controlled portfolio company of funds managed by Ares.

15.     Defendant Nathan W. Walton ("Walton") has served as a Preferred Director of the Company since March 2016, having been appointed to the Board by Ares. Defendant Walton is a Partner in the Private Equity Group of Ares Management, L.P. and joined Ares in 2006. Additionally, Mr. Walton serves on the Investment Committee of the Ares EIF funds. He also

[1]     The Board consists of seven directors, five of whom are elected by the holders of the Company's common stock, and two of whom are elected by the holders of the Company's special voting preferred stock – *i.e.*, Ares.

serves on the Board of Directors of, among other companies, the parent company of BlackBrush Oil & Gas, LP.

16.     Defendant Ronald D. Scott ("Scott") has served as a director of the Company since August 2016. Defendant Scott was nominated to the Board by Ares pursuant to a Stockholder Agreement between the Company and Ares that was entered into in connection with the closing of the sale of 5,051,100 shares of the Company's common stock to Ares.

17.     Defendants Williams, Smith, Ford, Riggs, Martin, Walton, and Scott form the Board of Directors of CWEI and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual Defendants at all relevant times had the power to control and direct CWEI to engage in the misconduct alleged herein.

## C.     Relevant Non-Parties

18.     Non-Party Ares Management LLC (with certain of its affiliates, previously defined as "Ares" or "Ares Management") made an investment in the Company (as outlined below) in mid-2016 and, as a result thereof, is the beneficial owner of 42% of CWEI's common stock. In addition, Ares possesses the right to elect up to two members of CWEI's Board and to recommend one other director to the Nominating and Governance Committee of the Board for appointment to the Board. According to the Company's 10-K Annual Report, "[t]hrough its elected and recommended Board members and substantial ownership of our common stock, Ares has significant influence in matters voted on by our shareholders, including the election of our Board members, and its interests may differ from the interests of our other shareholders."

19.     Non-Party Noble Energy, Inc. (previously defined as "Noble") is a Delaware corporation headquartered in Houston, Texas.

20.     Non-Party Wild West Merger Sub, Inc. (previously defined as "Merger Sub") is a Delaware corporation and wholly owned subsidiary of Noble that was formed solely for the purposes of effectuating the Proposed Transaction.

21.     Non-Party NBL Permian LLC (previously defined as "Merger Sub 2") is a Delaware limited liability company and wholly owned subsidiary of Noble.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of CWEI (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable. As of February 23, 2017, there were approximately 17,629,338 outstanding shares of CWEI common stock.  The actual number of public shareholders of CWEI will be ascertained through discovery.

25.     Questions of law and fact are common to the Class, including, among others:

a.  Whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Registration Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c.  Whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the

other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A.     Corporate Background

29.     CWEI is an oil and gas company engaged in the exploration for and production of oil and natural gas. The Company operates in Texas, Louisiana, and New Mexico. Its segments include oil and gas exploration and production and contract drilling services. It has holdings in approximately two oil shale plays in the United States, which include the Wolfcamp Shale in the Southern Delaware Basin of West Texas and the Eagle Ford Shale in the Goldings Area of East Central Texas.

30.     In the year preceding the announcement of the Merger Consideration, CWEI's stock price increased from just $18.77 (on January 14, 2016) to $103.98 (on January 13, 2017). As demonstrated below, this organic increase would have eclipsed the Merger Consideration in

mere weeks, such that the Merger Consideration acts as nothing more than a cap on the Company's stock price:



## B.     **Events Leading to the Proposed Transaction**

31.     In light of a recent downturn in the exploration and production industry, in August 2015, the Board formed a special committee to develop, explore, and evaluate strategic alternatives for the Company, including potential transactions involving a business combination, a recapitalization, a sale of assets or securities of the Company, or another extraordinary transaction. Goldman served as the Company's exclusive financial advisor during this process.

32.     In mid-January 2016, the special committee concluded that a secured debt alternative was favorable to the Company and its shareholders and, on March 8, 2016, CWEI entered into (1) a credit agreement with Ares providing for the issuance of second lien term loans

and common stock warrants and (2) an amendment to the revolving credit facility with its banks (the "Refinancing"). Upon closing of the Refinancing on March 15, 2016, CWEI issued term loans to Ares in the principal amount of $350 million, net of original issue discount of $16.8 million, for cash proceeds of $333.2 million. Concurrently, CWEI issued warrants to purchase 2,251,364 shares of its common stock at a price of $22.00 per share to Ares for cash proceeds equal to the original issue discount from the issuance on the term loans. The warrants represent the right to acquire approximately 12.8% of CWEI outstanding shares of common stock, or approximately 11.2% of CWEI common shares on a fully exercised basis. In connection with the issuance of the warrants, CWEI designated and issued to funds managed by Ares, as the initial warrant holders, 3,500 shares of special voting preferred stock, $0.10 par value per share, granting them certain rights to elect two members of the Board. Aggregate cash proceeds from the transaction were used to fully repay the outstanding indebtedness under the Company's revolving credit facility of $160 million, plus accrued interest and fees, and added approximately $180 million of cash to its balance sheet to provide additional liquidity to fund its operations and future development. Finally, on July 22, 2016, CWEI entered into an agreement to sell 5,051,100 shares of common stock to funds managed by Ares for cash proceeds of $150 million, or approximately $29.70 per share (the "Private Placement"), which transaction closed on August 29, 2016.

33.     In October 2016, Defendant Riggs was approached by representatives from two exploration and production companies referred to in the Registration Statement as Party A and Party B regarding a potential strategic transaction.   Thereafter, representatives of CWEI management met with representatives of Evercore to discuss the potential market interest for **and valuation of** CWEI. Thereafter, senior management instructed Evercore to reach out to six specified public companies, including Noble and Party A.

34.     Evercore contacted Noble on November 11, 2016 and the other five companies between November 10, 2016 and November 14, 2016. Four of these companies executed "short-form confidentiality agreements" with CWEI and were provided with limited confidential information pursuant thereto. The Registration Statement does not state whether these "short-form confidentiality agreements" were subject to standstill provisions.

35.     On December 9, 2016, Noble sent CWEI an indication of interest whereby each outstanding CWEI common share would be converted into $51.20 of cash and 1.9413 Noble common shares, representing an implied value of $128.00 per CWEI common share. On or about this time, Party A and the other companies that Evercore approached declined to submit indications of interest.

36.     On December 13, 2016, senior management and Evercore provided a summary to the Board of the various companies who had been contacted and the feedback received from each with respect to the Company's value and strategic alternatives. Also at this meeting, and purportedly "while not determining to engage in a sales process," the Board authorized management to continue sales discussions, to contact additional parties, and to engage **both Evercore and Goldman** as its financial advisors. The Board also directed senior management to prepare a standalone valuation of CWEI.

37.     Between December 15 and 21, 2016, representatives of Evercore contacted eight additional parties, including Party B.   Five of these companies executed "short-form confidentiality agreements" with CWEI and were provided with limited confidential information pursuant thereto. Again, the Registration Statement does not state whether these "short-form confidentiality agreements" were subject to standstill provisions.

38.     On December 21, 2016, Noble executed a "long-form confidentiality agreement," which was affirmatively subject to a standstill provision that would automatically terminate if, among other things, CWEI entered into a definitive merger agreement with another party.

39.     On December 23, 2016, Party B submitted a non-binding indication of interest to acquire all of CWEI's common shares in exchange for a mix of cash (50%) and Party B stock (50%), which Party B calculated at an implied value of $135 per CWEI common share, but which was subject to primary equity and debt offerings to finance the transaction and a meeting of and approval by the Party B stockholders.   Thereafter, on December 29, 2016, Party B executed a "long-form confidentiality agreement," which was also affirmatively subject to a standstill provision that would automatically terminate if, among other things, CWEI entered into a definitive merger agreement with another party.

40.     On January 5, 2017, Noble reaffirmed its interest in a potential transaction and changed its proposed consideration for each CWEI common share from $51.20 of cash and 1.9413 Noble common shares to $32.75 of cash and 2.5747 Noble common shares, an increase in the implied value of each CWEI common share from $128 to $131. On the same day, Party B likewise reaffirmed its indicative proposal and increased its proposed total consideration by $5.38 per share. However, according to the Registration Statement, "[a]lthough based on different assumptions than its earlier proposal, Party B's per share bid price remained at $135 per CWEI common share." This disconnect is not explained in the Registration Statement. Party B's proposed offer remained at 50% cash and 50% stock consideration and continued to be subject to primary equity and debt offerings to finance the transaction and a meeting of and approval by the Party B stockholders.

41.     On January 6, 2016, the Board met to discuss, among other things, "potential conflicts that could arise in a potential transaction and the need to assess the existence of any

board member conflicts of interest." In addition, at this meeting, CWEI senior management discussed a standalone valuation of CWEI that they had prepared and the underlying assumptions used to prepare the standalone valuation. This valuation is never disclosed in the Registration Statement.

42.     On January 9, 2017, Noble and Party B submitted updated written proposals to Defendant Riggs. Noble increased its proposed consideration for each CWEI common share from $32.75 of cash and 2.5747 Noble common shares to $34.75 of cash and 2.7874 Noble common shares, an increase in the implied value of each CWEI common share from $131 to $139. Noble also requested support agreements for the Proposed Transaction. Party B increased its proposed total consideration by $3.00 per share, with an implied per share offer of $138 per CWEI common share. However, Party B's proposed offer continued to be subject to the availability of the capital markets to fund a significant portion of the cash consideration and approval by Party B's stockholders.

43.     On January 9, 2017 and 10, 2017, the Audit Committee of the Board held telephonic meetings to discuss potential conflicts of interest relating to the Proposed Transaction, **including a potential make-whole payment to be received by Ares Management in connection with its term loan to CWEI and a change of control transaction, the form of consideration Ares Management would receive with respect to its warrants to purchase CWEI common shares, Defendant Scott's role as CEO of an affiliate of Ares Management, and the compensation to be received by directors and officers in connection with a change of control.** Despite these conflicts, the Audit Committee determined that none of these potential conflicts should preclude the applicable directors from participating in the deliberations regarding a potential transaction.

44.     On January 10, 2016, the entire Board concluded that Noble's proposal was superior to Party B's proposal. In addition, the directors concluded that, in light of risks associated with CWEI's ability to implement its standalone business plan, Noble's proposal was superior to what CWEI was likely to achieve on a standalone basis. The CWEI board authorized CWEI senior management to continue discussions with Noble and to negotiate final transaction documents. Evercore was instructed by CWEI senior management to notify Party B that the Board had concerns over its financing contingency and plan to access the capital markets.

45.     On January 12, 2017, the Audit Committee again met telephonically to discuss potential conflicts of interest, **including a potential make-whole payment to be received by Ares Management in connection with its term loan to CWEI and a change of control transaction, Defendant Scott's role as CEO of an affiliate of Ares Management, and the compensation to be received by Defendant Riggs upon a change of control pursuant to the terms of his employment agreemen**t. The Audit Committee again determined that none of these potential conflicts would affect the ability of any member of the CWEI Board to participate in the deliberations and to vote regarding the Potential Transaction. According to the Registration Statement, "[t]he Audit Committee also approved certain aspects of ancillary agreements to the transaction involving affiliates of CWEI." The Registration Statement does not identify these agreements. On the same day, the Compensation Committee of the CWEI Board met telephonically to approve the retention and severance plan arrangements contemplated by the Proposed Transaction.

46.     On January 13, 2017, the Board met to consider and approve the Merger Agreement. During this meeting, Goldman presented its fairness opinion and related analyses to the Board. The Registration Statement is entirely silent as to whether Evercore presented any

financial analyses or fairness opinion at this meeting.  Later that evening, the parties executed the Merger Agreement.

47.    On January 16, 2017, CWEI and Noble issued a press release jointly announcing the Proposed Transaction, which provides in pertinent part:

### Noble Energy to Acquire Clayton Williams Energy

*Increases Core Delaware Basin Position to Nearly 120,000 Net Acres*

*Materially Enhances Oil Growth Outlook, Adds Substantial Midstream Upside*

*Noble Energy Also Updates Four-Year Operating Plan*

**HOUSTON and MIDLAND, Texas (January 16, 2017)** – Noble Energy, Inc. (NYSE: **NBL** ) ("Noble Energy" or "the Company") and Clayton Williams Energy, Inc. (NYSE: **CWEI** ) ("Clayton Williams Energy") today announced that the Boards of Directors of both companies have unanimously approved and the companies have executed a definitive agreement under which Noble Energy will acquire all of the outstanding common stock of Clayton Williams Energy for $2.7 billion in Noble Energy stock and cash.

David L. Stover, Noble Energy's Chairman, President and CEO, stated, "We have been very disciplined in assessing expansion opportunities in the Delaware Basin and are extremely pleased to have reached this agreement with Clayton Williams Energy. This transaction brings all the key elements we value: excellent rock quality, a large contiguous acreage position adjacent to our own, and robust midstream opportunities, reinforcing the Delaware Basin as a long-term value and growth driver for Noble Energy. This combination creates the industry's second largest Southern Delaware Basin acreage position and provides more than 4,200 drilling locations on approximately 120,000 net acres, with over 2 billion barrels of oil equivalent in net unrisked resource. In addition to the benefits driven by larger scale, the midstream assets and planned buildout provide significant synergies and substantial dropdown potential in association with our ownership in Noble Midstream Partners."

Stover concluded, "We are rapidly accelerating activity in 2017, starting the year with four rigs operating in the Southern Delaware Basin – three on Noble Energy's acreage and one on the Clayton Williams Energy position. A second rig is planned to be added to the new acreage in the second quarter, following closing of the transaction, and a third later in the year, in order to exit 2017 with combined six rigs running in the Delaware Basin. Following our ramp of activity in 2017, the acquired assets are expected to be self-funding and accretive to Noble Energy's earnings and cash flow per share beginning next year. This is an excellent fit for Noble Energy, and we expect the transaction to generate substantial shareholder value. We look forward to a smooth and seamless integration of Clayton Williams Energy."

Clayton W. Williams, Jr., Chairman and CEO of Clayton Williams Energy, stated, "I am very proud of the company we have built over the past 25 years and I am pleased that Noble Energy will be leading the development of our properties going forward. Noble Energy's long track record of operational excellence and value creation, as well as its reputation as a tremendous corporate citizen, make it the ideal partner for us. We look forward to being shareholders of Noble Energy and benefiting from its world class asset portfolio."

**Acquisition Highlights**

- 71,000 highly contiguous net acres in the core of the Southern Delaware Basin in Reeves and Ward counties in Texas (directly adjacent to Noble Energy's existing 47,200 net acres). In addition, there are an additional 100,000 net acres in other areas of the Permian Basin.
- 80% average working interest in the Southern Delaware position, with more than 95% of the acreage operated.
- 2,400 Delaware Basin gross drilling locations identified, targeting the Upper and Lower Wolfcamp A zones, along with the Wolfcamp B and C.  The average lateral length of the future locations is 8,000 feet.
- Total estimated net unrisked resource potential on the acreage of over 1 billion barrels of oil equivalent in the Wolfcamp zones, with significant upside potential in other zones.
- Noble Energy's outlook is to increase production on the acquired assets from 10 MBoe/d currently (70% oil) to approximately 60 MBoe/d in 2020 in the Company's base plan.
- Highly competitive economics, with Wolfcamp A wells (estimated ultimate recovery of 1.0 million barrels of oil equivalent for a 7,500 foot lateral) generating approximately 60% to 90% before-tax rate of return at base and upside plan pricing, respectively.
- The acquired Delaware Basin acreage is largely undedicated to third-party oil and gas gathering and water systems, and approximately 12,500 acres are dedicated from a third-party operator.
- Existing midstream Delaware Basin assets include over 300 miles of oil, natural gas, and produced water gathering pipelines (over 100 miles for each product).

**Additional Transaction Details**

Clayton Williams Energy shareholders will receive 2.7874 shares of Noble Energy common stock and $34.75 in cash for each share of common stock held. In the aggregate, this totals 55 million shares of Noble Energy stock and $665 million in cash. While the aggregate amount of cash and stock in the transaction will not change, on an individual basis shareholders will be able to elect to receive cash or stock, subject to proration. The value of the transaction, based on Noble Energy's closing stock price as of January 13, 2017, is approximately $139 per Clayton Williams Energy share, or $3.2 billion in the aggregate, including the assumption of approximately $500 million in net debt.

The per share consideration represents a 21% premium to the average closing share price of Clayton Williams Energy over the past 30 days, and a 34% premium to the price on January 13, 2017, the last day of trading prior to the transaction.

Noble Energy intends to fund the cash portion of the acquisition through a draw on its revolving credit facility. As of the end of 2016, the Company's $4 billion facility was completely undrawn. Through ongoing portfolio management / optimization, Noble Energy anticipates the Company will generate in excess of $1 billion in proceeds in 2017.

The Company also anticipates retiring outstanding debt of Clayton Williams Energy assumed as part of the transaction at or following the closing. This, along with general and administrative cost elimination, will result in annual cost synergies to Noble Energy of approximately $75 million.

As part of the Company's valuation assessment, Noble Energy identified significant value relating to existing production and midstream opportunities. After adjusting for these items and net debt assumed, the purchase price represents approximately $32,000 per core Southern Delaware acre. The midstream valuation reflects the planned infrastructure buildout and the value of future cash flows.

**Shareholder Agreements and Timing to Close**

Funds managed by Ares Management, L.P., which owned approximately 35% of the outstanding shares of Clayton Williams Energy as of December 31, 2016, have entered into a support agreement to vote in favor of the transaction. Following completion of the transaction, shareholders of Clayton Williams Energy are expected to own approximately 11% of the outstanding shares of Noble Energy.

Closing is expected in the second quarter of 2017 and is subject to customary regulatory approvals, approval by the holders of a majority of Clayton Williams Energy common stock, and certain other conditions.

**\*\*\***

**Advisors**

Petrie Partners Securities, LLC acted as exclusive financial advisor to Noble Energy. Skadden, Arps, Slate, Meagher & Flom, LLP acted as legal advisor to Noble Energy. Evercore and Goldman, Sachs & Co. acted as financial advisors to Clayton Williams Energy. Latham & Watkins LLP acted as legal advisor to Clayton Williams Energy.

48.     Following the announcement of the Merger Agreement, the Audit Committee

consented in advance to the entrance by Goldman into the ETF Transaction (as defined below) with Ares Management, to any future entrance by Goldman or its affiliates into substantially similar hedging transactions with other CWEI stockholders, including Defendant Williams and the WCPL, and to Ares Management and other CWEI stockholders and Goldman discussing and negotiating prior to the closing of the post-closing hedge transactions (as noted below) with Goldman as counterparty.  According to the Registration Statement:

> The Audit Committee of the CWEI board discussed the general structure of the proposed hedging transactions, Goldman Sachs' earlier presentations to the Ares parties about the opportunity to hedge exposure to the Noble common shares included in the merger consideration, and the representation by Goldman Sachs to CWEI that, if CWEI were to request additional services from Goldman Sachs under the engagement letter between CWEI and Goldman Sachs before the closing of the merger and either Goldman Sachs or CWEI determined in good faith that Goldman Sachs was no longer able to fulfill its responsibilities as financial advisor to CWEI in connection with the engagement under such engagement letter as a result of the ETF transaction, such other hedging transactions with Goldman Sachs or its affiliates or such discussions and negotiations regarding any post-closing hedging transaction, Goldman Sachs and CWEI would negotiate in good faith appropriate modifications to such engagement letter, including a reduction of the fees payable to Goldman Sachs under such engagement letter to offset the retention of a different financial advisor by CWEI to fulfill the responsibilities that Goldman Sachs was no longer in a position to fulfill.

Notably, the Registration Statement does not outline the financial terms of the ETF Transaction or disclose when that Transaction first began being discussed by Ares Management, Defendant Williams, and/or the WCPL.

## C.   Conflicts Infecting the Process that Resulted in the Merger Agreement

49.     As noted above, Ares beneficially owns, either individually or through its affiliates, 42.0% of the outstanding shares of CWEI's common stock. In addition, Ares possesses the right to elect up to two members of CWEI's Board and has three current representatives on the Board. What is more, as acknowledged in the Company's annual report, "[t]hrough its

elected and recommended Board members and substantial ownership of our common stock, Ares has significant influence in matters voted on by our shareholders, including the election of our Board members." Unsurprisingly, Ares will receive lucrative benefits in the Proposed Transaction that are not shared by the Company's non-insider stockholders.

50.     *First*, in connection with its position as lender under CWEI's second lien term loan, which, according to the Registration Statement, "is expected to be repaid in connection with the consummation of the merger," Ares will receive a significant, but undisclosed, "make-whole payment. Specifically, under the term loan credit agreement, if the term loan is repaid prior to the third anniversary of its availability date, CWEI is required to pay, in addition to the principal and any accrued but unpaid interest on the term loan, a "make-whole amount" equal to the discounted value of all future interest payments from the date of repayment through such third anniversary and a 12.5% call premium. **Notably, the Registration Statement does not disclose how much this windfall is expected to be.**

51.     *Second,* and as noted above, Ares entered into the ETF Transaction with Goldman in connection with the Proposed Transaction. More specifically, the Registration Statement states:

> On February 22, 2017, after the receipt of the consent from CWEI described in "—Background of the Merger" beginning on page 25, the Ares parties purchased a number of cash-settled only European put options with respect to an exchange traded fund that tracks the energy sector (the "ETF" and such puts, collectively, the "ETF transaction") from Goldman Sachs (the "put counterparty"). At expiration of these put options, the put counterparty would owe the Ares parties cash in an amount equal to the excess, if any, of the strike price over the market price of the ETF shares at expiration, as determined under the terms of the ETF transaction. The Ares parties entered into the ETF transaction to help protect against volatility in their energy portfolio, including with respect to the Noble common shares included in the merger consideration. As of the date of the ETF transactions, less than 1.5% by value of the component securities of the index tracked by the ETF consisted of Noble common shares and the index was not sponsored by Goldman Sachs or any of its affiliates.

The terms of the ETF transaction are consistent with the put counterparty's ordinary practices for trades in indexes or exchange traded funds and do not explicitly include rights to adjust or terminate the ETF transaction based on the occurrence of events relating to the merger or that are specific to Noble or its securities. The put counterparty is obligated to negotiate in good faith an early unwind of the ETF transaction at the Ares parties' request, in which case the put counterparty would unwind any related internal hedge positions it may have at that time.

The put counterparty entered into, and will be acting as principal under, the ETF transaction for its own account. Therefore, the put counterparty's interests may differ from those of CWEI, the Ares parties, CWEI's other stockholders and Noble, depending on the occurrence of certain events and market conditions that have a material effect on the price, volatility or other characteristics of the ETF and its component securities. Accordingly, the put counterparty will look to its own interests and objectives in entering into and managing the ETF transaction and any related hedging activities, and neither the put counterparty nor any of its affiliates has or will advise CWEI (or any other person, including the Ares parties) with respect to the ETF transaction.

The put counterparty generally hedges its exposure in transactions such as the ETF transaction in a manner designed so that it does not take a directional view on the securities underlying such transaction. This hedging may include purchasing or selling various securities on a "long" or "short" basis, and entering into and unwinding derivative transactions with respect to the underlying securities or related securities. This hedging is intended to substantially neutralize the put counterparty's exposure to changes in the price of the shares of the underlying securities, is at the put counterparty's own risk, and may result in a loss or gain to it in an amount that may be less than or greater than the expected contractual benefit to the put counterparty under the ETF transaction being hedged, the amount of which will not be known until the ETF transaction has been exercised or expired and the put counterparty has completed its hedge unwind activities.

In accordance with industry practice, the individuals at the put counterparty who engage in these hedging transactions are generally separated by institutional information barriers from the Goldman Sachs team that provides financial advisory services to CWEI. It is the practice of the put counterparty to share a portion of any gain or loss that the put counterparty makes under the ETF transaction (and any related hedging transactions) with Goldman Sachs' Investment Banking Division (which division includes the Goldman Sachs team that provides financial advisory services to CWEI) as representatives of Goldman Sachs' Investment Banking Division have been involved in structuring and negotiating the ETF transaction.

The put counterparty or its affiliates may enter into hedging transactions

including in a form substantially similar to the ETF transaction with other CWEI stockholders, including Mr. Williams and The Williams Children's Partnership, Ltd., prior to the consummation of the merger. In the event the put counterparty or any of its affiliates enters into such other hedging transactions, it would be doing so for its own account and under circumstances similar to those described above.

The put counterparty or its affiliates and the Ares parties or other CWEI stockholders, including Mr. Williams and The Williams Family Partnership Ltd., may enter into discussions and negotiations prior to the closing of the merger regarding hedging transactions that the Ares parties or such other CWEI stockholders may enter into with the put counterparty or its affiliates as counterparty after the closing of the merger with respect to the Noble common shares received by such stockholders as merger consideration (each, a "post- closing hedge transaction"). The put counterparty or its affiliates would generally hedge its exposure in transactions such as the post- closing hedge transactions in a manner similar to that of the ETF transaction, except that in connection with the post-closing hedge transactions the put counterparty or its affiliates would likely borrow and sell and/or purchase Noble securities and/or enter into or unwind derivative transactions with respect to Noble securities.

As described under "—Background of the Merger" beginning on page 25, the Audit Committee of the CWEI board, acting on behalf of the CWEI board, reviewed and consented in advance to the entrance by the put counterparty and its affiliates into the ETF transaction and any substantially similar hedging transactions with any CWEI stockholder, including Mr. Williams and The Williams Children's Partnership, Ltd., and to the put counterparty and its affiliates and the Ares parties and such other CWEI stockholders entering into discussions and negotiations prior to the closing of the merger regarding any post-closing hedge transactions. Goldman Sachs represented to CWEI that, if CWEI were to request additional services from Goldman Sachs under the engagement letter between CWEI and Goldman Sachs before the closing of the merger and either Goldman Sachs or CWEI determined in good faith that Goldman Sachs was no longer able to fulfill its responsibilities as financial advisor to CWEI in connection with the engagement under such engagement letter as a result of the ETF transaction, such other hedging transactions with Goldman Sachs or its affiliates or such discussions and negotiations regarding any post-closing hedge transaction, Goldman Sachs and CWEI would negotiate in good faith appropriate modifications to such engagement letter, including a reduction of the fees payable to Goldman Sachs under such engagement letter to offset the retention of a different financial advisor by CWEI to fulfill the responsibilities that Goldman Sachs was no longer in a position to fulfill.

52.     Notably, the Registration Statement entirely fails to disclose when these negotiations occurred or the financial terms of the options.

53.     In addition, and as also noted above, Defendant Williams and the WCPL collectively own almost 35% of CWEI's common stock, and they have also been pre-cleared to engage in a similar transaction. Again, though, the Registration Statement fails to disclose if and when Defendant Williams and/or the WCPL conducted negotiations regarding these transactions.

**D.     The Merger Agreement Contains Onerous Deal Protection Devices.**

54.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no successful competing offers will emerge for the Company.

55.     Despite the unfair price, the Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers.  Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Noble a $87 million termination fee.

56.     Additionally, the Merger Agreement contains a strict no-solicitation provision, pursuant to which the Company is prohibited from soliciting competing acquisition proposals or, subject to certain exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.

57.     The Merger Agreement also contains an information rights provision that requires the Company to notify Noble of certain unsolicited competing offers and to provide Noble with information regarding such offers. In addition, the Merger Agreement grants Noble matching rights, which provide it with access to confidential, non-public information about competing proposals from third parties that it can use to prepare a matching bid and required CWEI to negotiate with it to amend the terms of the Merger Agreement in the event a superior offer is received.

58.     In addition, certain stockholders affiliated with Ares, who collectively hold approximately 42% of CWEI's common stock, entered into support agreements pursuant to which they agreed, among other things, not to exercise any appraisal rights and to vote in favor of the Proposed Transaction. Similarly, Defendant Williams and the WCPL, who collectively hold almost 35% of CWEI's common stock, entered into agreements pursuant to which they agreed, among other things, not to exercise any appraisal rights and to vote against any alternative proposal to the Proposed Transaction

59.     These provisions and agreements will cumulatively discourage other potential bidders from making a competing bid for the Company.   Similarly, these provisions and agreements make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares.

**E.      The Defendants Are Withholding Material Information from Shareholders.**

60.     Finally, on March 6, 2017, the Individual Defendants authorized the filing of the Registration Statement with the SEC in connection with the Proposed Transaction in order to convince CWEI's stockholders to vote in favor of the Merger.   As discussed below and elsewhere herein, the Registration Statement omits and/or misrepresents material information that must be disclosed to CWEI's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

61.     *First*, the Registration Statement fails to fully and fairly disclose certain material information concerning the background of the Proposed Transaction. Specifically, the Registration Statement fails to adequately disclose:

> a.   Whether the "short-form confidentiality agreements" referenced in the Registration Statement contained standstill and/or don't-ask-don't-waive provisions;

    b.  The "different assumptions" used by Party B in its earlier proposal and how these assumptions affected its bid such that a $5.38 per share increase did not result in an actual increase in the implied value of the bid;

    c.  CWEI management's standalone valuation of CWEI and the underlying assumptions used therein;

    d.  What specific "ancillary agreements to the transaction involving affiliates of CWEI" the Audit Committee approved on the eve of the execution of the Merger Agreement;

    e.  How much the make-whole payment to Ares will be;

    f.  When negotiations occurred regarding the ETF Transaction and the financial terms thereof; and

    g.  If and when Defendant Williams and/or the WCPL conducted negotiations regarding similar hedging transactions.

62.    *Second*, the Registration Statement fails to disclose material key inputs and assumptions underlying the analyses conducted by Goldman. Specifically, in connection with Goldman's *Selected Transactions Analysis*, the Registration Statement fails to disclose:

    a.  The individual "adjusted price per acre multiples" for each transaction;

    b.  The mean, median, and high/low of the observed multiples;

    c.  The source (or explain the assumption) that current production should be valued at $30,000 per flowing barrel of oil equivalent per day; and

    d.  CWEI's actual production as measured in BOE/day.

63.    In connection with Goldman's *Illustrative Net Asset Value Analysis*, the Registration Statement fails to disclose certain key estimates developed by CWEI's management and utilized by Goldman, including:

a. The "value of net undeveloped acreage owned by CWEI" in certain counties and how that value was determined;

b. The "value of midstream facilities owned by CWEI" and how that value was determined;

c. The "present value of general and administrative costs" and the projections underlying this line item;

d. The "present value of estimated mark to market commodity hedges" and the projections underlying this line item;

e. The "present value of taxes payable by Clayton Williams" and the projections underlying this line item;

f. The "net debt provided by management of CWEI"; and

g. Certain line items from CWEI's forecasts, including the projected "after-tax cash flows" for the reserves through the end of the forecast period, especially in light of the facts (1) that no terminal value was calculated, (2) the five-year forecast shows only negative numbers, and (3) "after-tax cash flows" were used in this analysis, while "unlevered free cash flows" were purportedly used un Goldman's *Illustrative Noble Pro Forma Discounted Cash Flow Analysis*, without explanation as to the difference.

64.    Finally, and similarly, in connection with Goldman's *Illustrative Noble Pro Forma Discounted Cash Flow Analysis,* the Registration Statement fails to disclose:

a. How Goldman calculated unlevered free cash flows from Noble's free cash flow forecasts;

b. How Goldman treated stock based compensation;

c. The range of implied perpetuity growth rates utilized by Goldman and

corresponding to the assumed terminal pricing multiples;

d. The *pro forma* net debt and the *pro forma* shares outstanding for Noble that Goldman assumed.

65.     *Third*, the Registration Statement fails entirely to disclose any information regarding financial analyses performed by and valuations reached by Evercore, the Company's other financial advisor in the Proposed Transaction and the one that actually reached out to and communicated with competing bidders. It is highly unusual for a financial advisor to take such a significant part in a sales process but not to render a fairness opinion or to provide valuation analyses – unless, of course, there is some conflict of interest that prohibits the advisor from doing so. In such a circumstance, any such conflict and any compensation paid to the financial advisor must be disclosed, and the Registration Statement's failure to address these issues in any way renders it materially misleading.

66.     *Finally*, the Registration is incomplete and misleading because it omits material information regarding the Company's financial projections, which were prepared by management and utilized by Goldman in its analyses.  Specifically, the Registration Statement provides projections for certain non-GAAP ("Generally Accepted Accounting Principles) financial metrics including EBITDA and free cash flow, but fails to provide the line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile these non-GAAP projections to GAAP.  Indeed, Defendants even acknowledge the incomplete and misleading nature of the non-GAAP measures in the Registration Statement:  "the unaudited financial and operating forecasts require significant estimates and assumptions that make them inherently less comparable to the similarly titled GAAP measures in the historical GAAP financial statements of Noble and CWEI." Despite acknowledging the materially incomplete nature of the non-GAAP financial measures, Defendants failed to reconcile the non-GAAP

measures disclosed in the Registration Statement.  Pursuant to applicable law, Defendants must disclose a reconciliation of the non-GAAP measures to the most comparable GAAP measures.

67.     Relatedly, Defendants must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP EBITDA and free cash flow metrics, including stock-based compensation, synergies, G&A expenses, MTM commodity hedges, and taxes payable.  Such projections are necessary to make the non-GAAP EBITDA and free cash flows projections included in the Registration Statement not misleading, especially in light of the fact that Goldman used "after-tax cash flows" (which it also failed to define) in its *Illustrative Net Asset Value Analysis* and "unlevered free cash flows" in its *Illustrative Noble Pro Forma Discounted Cash Flow Analysis*, without explanation as to the difference.  Relatedly, Defendants must disclose the definitions of "free cash flow," "after-tax cash flows," and "unlevered free cash flows," in light of the differing usage of these terms without any explanation as to the difference.

68.     The Registration Statement is materially incomplete and misleading because it omits the information identified above.  Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of CWEI.

## COUNT I

**On Behalf of Plaintiff and the Class Against**
**CWEI and the Individual Defendants for Violations of Section 14(a)**
**of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical

information regarding, among other things, the process that led to the Proposed Transaction and the key inputs and assumptions of the financial analyses performed by Goldman and Evercore in support of Goldman's fairness opinion.

71.     In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

72.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

73.     During the relevant period, Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

74.     Specifically, and as detailed above, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding the process leading up to the consummation of the Merger Agreement, key inputs and assumptions underlying Goldman's financial analyses, and the projections used by the Company's financial advisors in those analyses.

75.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Goldman reviewed its financial analyses with the Board and that the Board considered the financial analyses provided by Goldman in its fairness opinion. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

76.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

77.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

78.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

79.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

80.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of CWEI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CWEI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

82.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

84.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the

Merger Agreement.   The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

87.     Plaintiff has no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: March 23, 2017                          Respectfully submitted,


                                               **FARUQI & FARUQI, LLP**



                                               By: */s/ James R. Banko*
                                               James R. Banko (#4518)
                                               Michael Van Gorder (#6214)
                                               20 Montchanin Road, Suite 145
                                               Wilmington, DE 19807
                                               Tel.: (302) 482-3182
                                               Email: jbanko@faruqilaw.com
                                               Email: mvangorder@faruqilaw.com

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com


*Attorneys for Plaintiff*